claim of ownership or color of title. [Sell v. McAnaw, 158 Mo. l. c. 471, and cas. cit.]

As hereinbefore pointed out, it seems to be conceded in the briefs that the defendant was a brother of the plaintiff's deceased husband, and there is nothing to show that he held the possession adversely to his deceased brother at any time. Mordekiah Crowl died in April, 1899, without issue, and leaving the plaintiff, his widow, surviving him; and under sections 2939, 2941, Revised Statutes 1899, the plaintiff, as his widow, was entitled to take one-half of the real and personal estate belonging to the husband, at the time of his death, absolutely, subject to the payment of his debts, or to take one-third part of all the land whereof the husband was seized of an estate of inheritance at any time during the marriage, and to which she had not relinquished her right of dower, for and during her natural life. In this case the widow elected to take the one-half of the real and personal property, subject to the payment of the debts, and this was the sum of her recovery allowed her in this case. Upon the case made, therefore, there is no doubt whatever that the plaintiff is entitled to the relief accorded her in the circuit court, and the judgment of that court is affirmed. All concur.

# ROOT v. KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.

Division One, March 30, 1906.

1. **NEGLIGENCE:** Quick Action in Emergency: Contributory Negligence. The jumping by a brakeman from an engine about to cross a burning bridge will not be over-closely scrutinized in passing on the question of his contributory negligence. Men suddenly called upon to consider a question of life or death in the face of danger imperiously menacing and amid confusing perils, are not required to act with coolness and precision.

2. ———: Assumption of Risks. A servant does not assume the risks of supervening acts of negligence of the master. A brake-

man does not assume the risk of an accident due to the negligence of the railroad company in permitting a bridge over which the train is to pass to be burned.

3. ———: **Fellow-Servant: Uniting With Company's Negligence.** Where the negligence of the conductor in running the train in Indian Territory at a negligent rate of speed, united with the negligence of the railroad company to injure a brakeman, a fellow-servant of the conductor, the company is liable to the brakeman.

4. ———: **Fire: Proximate Cause: Reasonable Inference: Conjecture.** Where there are facts strongly sustaining the jury's finding that the fire which caused the bridge to burn was communicated from burning trees' and other combustible matter to logs and debris, placed in barrow pits on the right of way a few feet from the trestle by the section hands, and from them to the trestle, and those facts furnish ground for a reasonable inference that the fire originated in that way, the verdict will not be set aside, either on the ground that no direct proof was offered to show that the fire was communicated from the logs and debris in the barrow pits to the trestle, or on the entirely conjectural theory that the solid logs of the trestle were set on fire by live coals which might have dropped from an engine which passed over the trestle a short time before the accident. Where there are present facts and inferences about which honest men might differ, the question of cause is not one of law, but for the determination of the jury.

5. ———: **Fellow-Servant: Indian Territory: Common Law: Construction: Arkansas Decisions.** If plaintiff has no cause of action in the Indian Territory, where he was injured and where the common law prevails and where, by act of Congress, the laws of Arkansas are in force, in that he was a fellow-servant of that one of defendant's employees whose negligence brought about the fire which resulted in his injury, he has none in Missouri. But the common law is a common heritage; it is a law of this State, and the courts of this State have the right to adopt their own construction of the common-law in reference to fellow-servants. But adopting the construction of the courts of Arkansas in defining fellow-servants, it is held that a roadmaster who passed on a tour of inspection over the road, inspected the manner in which inflammable debris and combustible material were taken from under a trestle and placed in barrow pits a few feet from the trestle, and presumably stamped that act of the foreman and the section men with his approval, and the foreman himself, were not fellow-servants with a brakeman on a train who was injured as a result of the burning of the trestle, the fire being communicated from the combustible matter in the barrow pits, but stood in the shoes of the railroad company.

6. ――――: **Evidence: Unconnected Remote Testimony: No Motion to Strike Out.** The issue was the presence on the right of way at the time the trestle was burned of inflammable matter, and respondent was permitted, over objection and under a promise that he would show that the same condition continued down to the date of the injury, to show that some months previously large quantities of driftwood floated on to the right of way and lodged against the trestle. But no testimony was offered to show that such driftwood was permitted to remain there until the time of the injury. *Held,* error, since it cannot be determined that the jury were not influenced by this remote unconnected testimony. Nor does the fact that appellant did not move to strike out the testimony alter the case, for it was not appellant's fault that it was introduced.

7. ――――: ――――: **Hypothetical Question.** A hypothetical question should be predicated on the testimony. It should not assume facts to exist which the evidence does not show to exist.

8. ――――: **Instruction: "Liable" to Occur.** The jury were told that "it was the duty of defendant to exercise ordinary care to keep its right of way free from dry and combustible matter which would be *liable* to take fire," etc. *Held,* that the use of the word "liable" was error. Likely or probably might properly have been used in its stead. It is the duty of the master to supply the servant with a reasonably safe field of operation, a reasonably safe place in which to work, etc., but no more.

Appeal from Bates Circuit Court.—*Hon. W. W. Graves,* Judge.

REVERSED AND REMANDED.

*S. W. Moore, Cyrus Crane* and *H. C. Clark* for appellant.

(1) The court ought to have sustained defendant's demurrer to the evidence at the close of plaintiff's case. (a) The evidence introduced by plaintiff failed to show that the fire in the bridge was caused by any negligence on the part of defendant, or as plaintiff alleged. (b) Because the verdict of the jury is founded merely on guess and conjecture. Peck v. Railroad, 31 Mo. App. 123; Shelden v. Railroad, 29 Barb. 226; Stokes v. Burns, 132 Mo. 223; Smillie v. Dollar Store, 47 Mo. App. 402;

Smart v. City, 91 Mo. App. 586; Moore v. Railroad, 28 Mo. App. 622; Browning v. Railroad, 106 Mo. App. 729. (2) The court erred in admitting testimony offered by plaintiff. Stoher v. Railroad, 91 Mo. 517; Collier v. Railroad, 93 Mo. App. 147; Hipsley v. Railroad, 88 Mo. 354; Seafield v. Bohne, 169 Mo. 546; Russ v. Railroad, 112 Mo. 48; Hicks v. Railroad, 124 Mo. 125; State v. Brown, 181 Mo. 215. (3) The court erred in giving plaintiff's instruction 7. This instruction does not properly declare defendant's duty and placed a greater burden on it than is warranted by the law. Railroad v. Dennis, 38 Kan. 426; White v. Railroad, 31 Kan. 280; Hogan v. Railroad, 150 Mo. 49; Devlin v. Railroad, 87 Mo. 552; Beasley v. Transfer Co., 148 Mo. 421; Berning v. Medart, 56 Mo. App. 449. (4) The court erred in refusing defendant's instruction 3. By this instruction the defendant sought to have the jury instructed that defendant was entitled to knowledge, or opportunity of knowledge, of the danger, if any, of fires outside of the right of way and time to prevent injury therefrom. This feature was not incorporated in any of the instructions given, and failure to do so was error. Dickson v. Railroad, 124 Mo. 140; Goodrich v. Railroad, 152 Mo. 222; Williams v. Railroad, 119 Mo. 316; Hurst v. Railroad, 163 Mo. 319; Oglesby v. Railroad, 150 Mo. 77; Feary v. Railroad, 162 Mo. 96. (5) The court erred in refusing, at the close of all the evidence, to direct the jury to return a verdict for defendant. Because: (a) The negligence, if any, was that of fellow-servants, for which defendant was not responsible. (b) The accident was shown to have been caused directly and proximately by the negligence of the engineer in failing to obey the rules of the company and stop the train in time. (c) The evidence showed beyond any controversy that the fire did not occur as plaintiff claimed. Act of Congress, May 2, 1890, sec. 31; Mansfield's Digest of Statutes of Ark., 1884, ch. 207; Railroad v. Gaines, 46 Ark. 555; Railroad v. Rice, 51 Ark.

467; Fordyce v. Briney, 50 Ark. 206; Railroad v. Henson, 61 Ark. 302; Railroad v. Hambly, 154 U. S. 349; Martin v. Railroad, 166 U. S. 399; Sanger v. Flow, 1 C. C. A. 57 (48 Fed. 152); Railroad v. Brown (Ark.), 54 S. W. 865; Loranger v. Railroad, 62 N. W. 137; Schaub v. Railroad, 106 Mo. 88; Grattis v. Railroad, 153 Mo. 380. (6) The court erred in refusing to sustain defendant's motions for new trial and in arrest of judgment. (a) The verdict was excessive under the evidence. (b) Plaintiff's case was not proven. (c) The overwhelming weight of the evidence was in defendant's favor.

*Thos. J. Smith, W. O. Jackson* and *Geo. W. Wright* for respondent.

LAMM, J.—Root was head-brakeman, riding on the engine of one of defendant's freight trains of seven cars and a caboose — four cars laden with coal and three with hay. In running south at midnight on July 16, 1901, a mile or so south of a station named Poteau, in the Indian Territory, as the engine approached a long trestle spanning a depression, swamp or slough (called a creek by some witnesses) through which water flowed from the west to the east at flood times in Poteau river, a nearby stream, a fire was discovered in and toward the far end of the trestle, as near as we can determine from the evidence, about one thousand feet away from the engine at the time. The engineer applied his emergency air, slowed up but did not stop before the engine reached the fire. Facing this emergency, when the fact became apparent that the engine would not stop before reaching the burning part of the trestle, on the advice of the engineer and by common consent, all employees on the engine, to-wit, the engineer, fireman and plaintiff, jumped from its steps to the ground, a distance of from ten to twelve feet. By jumping plaintiff's right ankle was concededly injured and, it is

claimed on one side and controverted on the other, that by the jump and by being struck in the small of the back by a rail, which bulged out simultaneously with his jump, kidney and spinal troubles ensued, resulting in traumatic neurasthenia, paralysis and a group of associated ills.

Plaintiff had judgment below for $8,000, from which defendant appealed.

The paper issues were as follows:

The petition alleges in effect that the country in the vicinity of the trestle was timbered; that defendant negligently allowed quantities of timber, brush, leaves, driftwood and other combustible matter, carried down at high water and lodged under said trestle and upon the right of way adjacent thereto, to accumulate and remain thereunder and upon said right of way, particularly under the south end of said trestle, until the date of the accident; that the creek spanned by the trestle and the water supply thereof, licked up by a drought, dried away; that said matter, so lodged and accumulated, became inflammable and susceptible to ignition from sparks and coals of fire from defendant's passing locomotives and from prairie and forest fires, then raging in the region; that the drought had lasted for thirty days; that the trestle was constructed of wood and became dry and inflammable and in danger of catching fire from passing locomotives and from forest and prairie fires—all of which was known by defendant, or by the exercise of ordinary prudence could have been so known for more than thirty days prior to the injury of plaintiff; that defendant negligently failed to exercise care to remove said combustible matter from beneath said trestle and from its right of way, or to keep and maintain constantly a watchman, patrolman or guard to watch and guard said wooden trestle after the passage of trains and for the purpose of discovering and extinguishing fire that might catch in said

195 Sup.— 23

inflammable matter, or in said trestle, or upon its right of way adjacent thereto, from passing trains or said prairie or forest fires along defendant's right of way; that because of said negligence a fire caught in the dry bridge itself, or in the debris beneath it, from prairie or forest fires along defendant's right of way, or from engines passing over the trestle, which fire necessitated plaintiff's leap from the engine and which acts of negligence caused plaintiff's injury.

The answer was a general denial, coupled with a plea that negligence on the part of plaintiff contributed to his injury; that the acts of his fellow-servants caused it; the assumption of the risks of his employment was pleaded, and that the injury occurred in the Indian Territory; that in said Territory the common law upon the subject of master and servant and fellow-servants was in force at the time, and according to said common law in said Territory the plaintiff was a fellow-servant with the trainmen, including the engineer, conductor and others, and a fellow-servant with the section foreman and the section men and inspectors of the track, and under said law defendant was not liable to plaintiff for any acts of said fellow-servants.

The reply was a general denial of the allegations of the answer, and, further, that if the common law was in force in the Indian Territory (which plaintiff denied) then, under such common law, plaintiff was not a fellow-servant with those of defendant's employees whose duty it was to keep and maintain the track, right of way and trestle of defendant in a reasonably safe condition.

At the close of plaintiff's case, a general demurrer was interposed and overruled, defendant excepting. A special demurrer was then interposed to the charge of negligence in the petition pertaining to the failure to have a watchman, patrolman or other guard at the trestle. This was sustained. At the close of the whole case, the court instructed the jury, at the request of the

defendant, that the charge of negligence in not keeping a watchman, patrolman or other guard at the trestle had been withdrawn and they could not find for plaintiff on that charge; that if fire was communicated to the trestle from passing engines, then their verdict should be for defendant, and that if it was communicated to the trestle from sparks from burning trees off of the right of way blown over on the trestle, then their verdict should be for defendant, and also told the jury that if the fire was communicated to the trestle in any other manner than through inflammable matter on the right of way they should find for the defendant.

By still another of defendant's instructions the issues of fact submitted to the jury were restricted, thus:

"Before plaintiff can recover he must prove by a preponderance of the evidence:

"First, that defendant was negligent in permitting inflammable matter to accumulate upon its right of way in proximity to fires outside of such right of way and in such quantities that such inflammable matter, if any, was likely to catch on fire; and

"Second, that fire was communicated from the fires outside of the right of way to said inflammable matter and extended therefrom to said trestle and caused the burning of the same; and

"Third, that the presence of such inflammable material upon said right of way, if it so existed, directly caused the injuries, if any, to plaintiff."

The learned trial court refused to adopt the views of appellant's counsel evidenced in certain instructions offered, one of them a peremptory command to find for appellant, and exceptions were saved. So, too, that court modified certain of appellant's instructions and gave certain instructions for respondent, and exceptions were saved. The correctness of rulings, *nisi*, on certain evidence admitted for respondent was duly challenged below and is assigned for error here, as well as the rulings on instructions.

The several assignments of error deemed material to be considered, together with those additional facts uncovered at the trial essential to an understanding and determination of the case, will be set forth in the course of this opinion.

I. It is contended by appellant that there was no case to go to the jury under the issues as narrowly whittled down by the court.   In other words,   *first,* the ground of recovery left standing being the accumulation of inflammable debris negligently on the right of way, there was no evidence tending to show that this negligent accumulation caused the fire in the bridge, hence, respondent had no case; *second,* that if the fire in the bridge was communicated through a negligent accumulation of inflammable debris, then, the acts of the section men and section foreman in allowing such accumulation were the acts of fellow-servants of the trainmen, and on that theory respondent must be cast; and, *finally,* that the negligence of the engineer, a fellow-servant of respondent, was the proximate cause of the injury, and, hence, no recovery would lie.   Is there substance in either of these contentions, or in the defenses of contributory negligence or assumption of risks?  Let us see.

(1)  There is no evidence worthy of the name tending to show that respondent himself was negligent.   He was an experienced railroad man, it is true, but he was a brakeman, not charged with the duty of running the engine.   He jumped when the engine was about two car-lengths from the fire.   It is not strongly contended by the learned counsel for appellant that respondent was not justified in jumping in the appalling emergency confronting him.   True it is, the evidence shows the engine cleared the burning place in the trestle and stopped, and, if respondent had stayed where he was, no hurt would have come to him.   His escape, however, was like that of a brand plucked from the burning, or

with the smell of fire on his garments, for the four cars of coal next to the engine either then, or presently, went through the trestle and one end of the tender went down. We may not be allowed to review this transaction from the standpoint of the way it looks to us, glancing back. We *know*—he did not know. It must be judged of by the way it would look to a reasonable man before the jump. Being suddenly called upon to consider a question of life and death in the face of a danger imperiously menacing him, he acted on appearances under a natural and allowable impulse of self-preservation and the law will not concern itself over-closely in scrutinizing and gauging his judgment, because men facing confusing perils sprung on them quickly are not called on to act with coolness and precision. The impelling question is whether appellant's own skirts are clear of blame for the fire, rather than whether respondent acted with good judgment in escaping its flames, and, in our view, the contributory negligence of respondent may be considered out of the case under the facts presented for adjudication.

(2) So, too, the assumption of risks pleaded in the answer may be eliminated; because, though it may be said generally a servant assumes the ordinary risks incident to a given employment, yet he does not assume the risk of supervening acts of negligence of the master, and it is such alleged supervening acts of negligence that are to be dealt with in this case. It may be said, in passing, that Root was a new man on the road, had been in appellant's employ but a few days, passing over this trestle but six times, usually in the night, and he was not shown to have any knowledge of the condition about the trestle or on the right of way, and, therefore, we may properly put away the defense of assumption of risks.

(3) But, appellant says, the proximate cause of the injury was the negligence of the engineer in running his train too fast and approaching the bridge with-

out caution. On this head it was shown in evidence he was running, say, twenty-three miles an hour as he came around a curve in view of the trestle. It is shown that as the engine came around said curve, about one-thousand feet from the fire, on a slight down grade, the steam was cut off, and, when the fire was discovered, the emergency air was put on. It was furthermore shown that all the cars, as well as the engine, were equipped with air. A rule was in evidence requiring freight trains to be run at a rate not to exceed eighteen miles an hour. On the 8th of July the trainmaster, having in charge the trainmen on that part of the road, issued the following order:

"Office of Trainmaster, Pittsburg, July 8, 1901.— Bulletin to Conductors and Engineers.— Owing to extreme heat and drought there is a great liability of damage being done by fire. You will be very watchful and proceed cautiously in approaching bridges and obscure places. In case of fire being found on the right of way you will not hesitate to stop and do all in your power to extinguish such fires and use back fires whenever it seems practicable to do so. All fires found on our right of way should be reported to this office by wire from first telegraph station, and give milepost location, stating how far north or south of milepost.

"DAY MILLS, Trainmaster."

It was also in evidence, and uncontradicted, that a train equipped as this one, on that grade, at a going speed of eighteen miles an hour, could be stopped in less than four hundred feet, and going at twenty-five miles an hour, in five hundred feet.

The most that can be said of this proof is that it tended to show the engineer, a fellow-servant of respondent, was running his train negligently. The court instructed the jury that if the negligence of the engineer was the sole cause of the injury, respondent could not recover; but the jury were further instructed that

if the negligence of the fellow-servant united with the negligence of appellant to produce the injury, then respondent could recover. If A and B contribute to the injury of C, and if A is C's master and B a fellow-servant, C may recover against A. [Browning v. Railroad, 124 Mo. 55.] This is also the law in Arkansas. [Neal v. Railroad, 71 Ark. 1. c. 450-1.]

(4)  A general understanding of other facts uncovered at the trial is a necessary preliminary to the consideration of the principal propositions in hand, and those facts, avoiding detail, will now be given.

The trestle ran north and south, and was a wooden structure made of bents, stringers, ties and rails. Each bent was composed of a group of oak piles, ten to twelve feet above ground, and a foot or more square. Said bents were about fourteen feet apart and the superstructure consisted of said stringers, ties and rails. The testimony does not agree as to the exact length of this trestle, but it was several hundred feet long. The road at this place ran through a forest and the right of way was one hundred feet wide with the roadbed in the center. As said, there was a slough or cutoff, filled with running water in flood times—water that left Poteau river to the west and ran through this slough, and back into Poteau river farther east. It was across this slough or draw, the trestle was built. A long-continued and searching drought in the summer of 1901 afflicted the region through which appellant's road ran. Fires were occurring and were naturally expected to occur along the line. Logs, dead trees, stumps, brush and even standing brambles and smaller growths had become somewhat combustible. In this prevailing condition of danger, appellant issued through its superintendent to its road-masters, including P. Sloan, the roadmaster in charge of the track at the place in question, on the 7th day of July, 1901, the following circular order:

"Dear Sirs: If you have not already done so, please proceed at once to remove all vegetable matter from under bridges, buildings, piles of material, etc., to prevent damage by fire. Also do everything you can consistently to prevent damage by fire to property adjoining right of way. Also report every case of fire being set along track by sparks dropping from ash pans of engines.

"Acknowledge receipt. Yours truly,

"W. COUGHLAN, Superintendent."

On the 8th day of July, 1901, Mr. Sloan issued the following circular order:

"Spiro, 7 — 8, '01.

"CIRCULAR NO. 26.

"All Foremen: You will at once remove all vegetable matter from under bridges, buildings, telegraph poles, piles of materials, etc., to prevent damage by fire, and do everything you can consistently to prevent damage by fire to property adjoining right of way. Also report any case of fire being set out along track by sparks dropping from ash pans of engines. Do not set fire to any old trees or timber of any kind during dry and hot weather.

Acknowledge receipt. "P. SLOAN, Roadmaster."

One Parsons was the section foreman having charge of section 47, covering the trestle in question, and on a day not precisely located but shown by his weekly "force report" to be within a period covered by the 8th to the 13th of July inclusive, he, with a force of ten men, cleaned under that trestle and others and about telegraph poles in obedience to the order of Roadmaster Sloan. The plan adopted at the trestle in question was to clean out the stuff to a distance of three or four feet on each side of the trestle. Respondent called to the stand the section foreman, Parsons, and other employees engaged in this work. By Parsons, on cross-examination, it was shown there was no brush or rub-

bish or stuff to burn under the trestle before it was cleaned out; that there was nothing but small grass and a few weeds. By another witness, Thornton, who was then a section man and was engaged in farming at the time he testified, it was shown that they cleaned out under the trestle "mighty clean and nice." Then the following occurred:

"Q. What did you do with the stuff that you cleaned out from under the bridge? A. Part of it we piled up. Piled part of it out where we got through, you know, and part of it we dragged out in a little branch that was there — barrow pit; part of it was laying in there and part on the bank. . . .

"Q. Now, about how far from this trestle was this stuff raked out? A. We was supposed to take it about six feet.

"Q. Not what you were supposed to, how far did you take it? A. About three or three and a half feet from the trestle.

"Q. What was the nature of this stuff that you cleaned out from under this bridge? A. It was logs, stumps and brush and stuff that had been washed there from the overflows.

"Q. What was the nature of the stuff you cleaned out from under the trestle as to being wet or dry? A. Why, it was dry."

This witness also testified that there were two dry stumps left standing under the trestle, as we understand the evidence. Other evidence was introduced tending to show that there were dry (and presumably rotten) logs on the right of way, one of them, at least, coming as close as eight feet of the trestle, and drift lying about. There was a so-called public road running adjacent to the right of way on the west, and at this immediate time a gang of men, not working for appellant, were cutting a public road to the east of the right of way and immediately adjacent thereto—the object being to drain it into the "barrow pit." It should

be said, furthermore, that along the extreme verge of the right of way to the east, as likewise to the west, barrow (or borrow?) pits had been dug, out of which the material had been taken to make fills in the roadbed. We are not concerned about the barrow pit on the west, but the one on the east made a continuous ditch, useful for drainage, and this pit was dry except at the south end of the trestle, where there was a little water. The trestle fire burned to about forty-two feet of the south end and seems to have been confined to the length of four cars, about 180 feet. Whether or not there was any water in the pit due east of this burnt part of the trestle is not clearly shown, but some of the testimony tended to show it was dry. We take it that the "branch" referred to by witness Thornton, where some of the combustible rubbish was piled, was this dry barrow pit. The men engaged in cutting out this public road were using fire to burn the brush and whatever down, or cut down, stuff would burn. During July 15th and possibly before, a short distance east of the new public road, fires were in the timber among the dead trees. It was in evidence and uncontradicted that the men engaged in this road work "chunked up" their log or brush heaps about quitting time and that they were then afire. On July 15th, Parsons, with his gang of section men, was about a mile and a half or two miles south of the trestle and these men were in view of a smoke that was in the neighborhood of the trestle on the east. The wind during the afternoon sat in the northwest, but about sundown, or seven o'clock, whipped around to the northeast and blew with vehemence for a short time, bringing in its train a slight fall of rain. Three witnesses, a farmer named Smith, and his wife and daughter, gave the most graphic description in the record of the prevailing condition of things at that time. They were returning home from labor in the field and were on the east of the trestle. The northeast wind in a gale was blowing a stream of live coals and rotten

chunks ablaze from dead standing trees east of the right of way, and apparently alive with fire from top to bottom, on and across the right of way and over and on the trestle about where it was burnt. So strong was this storm of fire that Smith could not drive between the burning trees and the railroad and, accordingly, had to veer off. They noticed no fire on the right of way nor on the trestle. The last witness passing was a liveryman in a buggy, with top up and side curtains down. This was about nine o'clock p. m. He saw fires to the east but none on the right of way and none on the trestle. At least two trains passed between six o'clock and twelve, but there is no evidence indicating that any fire escaped from the ash pans of either engine. In this condition of things about 12:05 o'clock on that night, after the engine of respondent's freight train, as said, came around a curve some distance north of the trestle, a fire was discovered blazing about a foot high above the trestle itself. At that time, or immediately before, respondent saw trees afire to the east of the trestle and possibly off of the right of way. Respondent introduced witnesses in the employ of appellant company, who, on cross-examination, made it plain that they came on the scene, one, about two hours, and others, four or five hours after the fire, and some of these witnesses examined and then could discover no trace on the ground that the fire off of the right of way to the east had spread continuously to the right of way and over the right of way to the trestle. Moreover, there is testimony showing that the coal cars and coal went down and burnt and that this latter fire was somewhat wider than the trestle itself. There is other evidence tending to show that the right of way to the east of the burned place in the trestle had at that time been burnt over and that there were burning logs then on the right of way and, as we understand it, all the inflammable stuff on the right of way east of the burnt section of the trestle, save a log or so, had been con-

sumed, or was burning. Appellant introduced evidence tending to show that there was no fire on the right of way east of the trestle at the time of the accident—at least, the witnesses didn't notice any.

We have thus condensed the facts of a long record relevant to the question now in hand, to-wit, whether the case was a proper one for the jury (barring for the present any consideration of the theory that the trackmen were fellow-servants with the trainmen), and, considering those facts, we announce our conclusion to be that the court did not err in overruling the demurrer to respondent's evidence or in refusing appellant's peremptory instruction at the close of the case. Because:

Appellant's contention is that the negligence, if any, in allowing the inflammable debris to accumulate on the right of way is not shown to be the proximate cause of the fire, i. e., that there is no substantial evidence showing the fire was communicated to the trestle through this debris. Appellant suggests that an engine may have dropped coals of fire from its ash pan on the trestle and that this view presents a reasonable cause of the fire's origin. If there were no facts pointing to a more reasonable theory of the fire, then the theory suggested by appellant would be well enough, but in the presence of the other facts pointing to a more reasonable theory of the fire, the engine theory, in our opinion, does not rise to the dignity of more than a conjecture—a possibility—when compared with the theory that the fire was communicated through the debris. An engine has an ash pan containing, we will say, hot ashes and live coals. From it coals of fire might escape. The circular letters of Superintendent Coughlan and Roadmaster Sloan show they had in mind this very contingency. Based upon this possibility and upon the passage of two engines between dark and midnight, an airy and ingenious fabric of reasoning is built up that these engines caused this fire. No proof exists that the ash pans of these engines were out of repair or leaked

fire; no proof is offered that a coal of fire escaped from such ash pans. One of these engines passed early in the evening. If, to use a homely simile, it had laid an egg in the shape of a live coal, hatching subsequently into a blaze, the presumption would be the engineer or fireman on the second engine, passing several hours later, would have discovered it and reported it. No such discovery is indicated in the proof, hence, in appellant's hypothesis, the first engine should be eliminated. Its theory, then, must be held to stand or fall upon the passage of the second engine. The trial court permitted that theory to go to the jury, at appellant's request, as a question of fact, and the jury weighed it in the balance and found it wanting in the presence of other facts pointing with more reasonable certainty to another origin of the fire. With their judgment we rest content.

But appellant says there is evidence that at dusk of July 15th, fire was in the air blowing over the trestle and, what is more, over that part of the trestle burned. Appellant says the proof shows no fire ran along the ground from fires on the outside of the right of way and left trace on the ground of communication to the debris on the right of way and thence to the trestle, and that in the absence of such proof there is nothing to go to the jury.

Of this contention it may be said that one theory advanced weakens another. For instance, one of appellant's notions is that fire was communicated to the trestle through the air by coals blown directly over the right of way and on the trestle, and hence it should escape liability on the theory of the court's instruction. But if coals of fire were blown through the air on the trestle and thereby, like a serpent on a rock, or a bird in its flight, left no trace of passage, then, by the same token fire could have been blown through the air and have rained down on the right of way and on the debris in the windrow about three feet from the trestle, or on the rotten and dry logs on the right of way, or

stumps, or on the rubbish stored in the branch or bar-
row pit, and this method of communicating fire could
not be shown by a trail on the ground connecting the
fire raging to the east of the right of way up to and with
the debris on the right of way.  Now, the proof shows
that coals of fire were raining down on the right of way
and on the debris accumulated there, so that if we
would allow appellant's contention that a lack of trace
on the ground of communicated fire is fatal to a re-
covery, the same contention militates against its present
theory of defense.  The truth is, the contention is un-
sound; for with fire raining from the air, why bother
with traces on the ground?  And while the communica-
tion of fire from this debris to the trestle is not proved
by eyewitnesses or by direct proof, yet to our minds
the transmission of fire in that way to a dry trestle lies
above mere possibility and conjecture and comes within
the realm of reasonable and natural inference; for, as-
suming the debris was there, assuming the fire at one
time was outside the right of way, assuming the wind
took up this fire and whirled it on the right of way in
coals and burning chunks, assuming the fire on the tres-
tle was seen some hours afterwards—we say, assuming
all these things shown by the proof—then it seems rea-
sonable to conclude, given some wind stirring, after-
wards, or none at all, that a live coal of this rained-
down fire, falling on a rotten log or a mass of chunks
or other debris, would naturally catch and smolder in
ambush and presently break forth with such fury as to
ignite a nearby dry structure, and that all this would be
much more reasonable than to conclude that a live coal
falling on top of the large, bare, sound timbers of a
railroad bridge would smolder and lurk and some hours
afterwards break out into a consuming blaze.  The one
theory furnishes a *matrix* and feed for the fire—the
sustained application of igniting heat and, since flames
ascend, it dovetails into the proved fact that the fire
was discovered in the top of the bridge.  The other the-

ory furnishes no matrix for the fire except solid timber igniting from a live coal.

Speaking to the subject of liability for fires, it has been said (13 Am. and Eng. Ency. Law [2 Ed.], 444): "It is not essential to a recovery that the plaintiff should introduce direct proof of the particular act of negligence which caused the damage complained of. Thus, where the proof did not show whether the fire was communicated first to the dry grass and combustibles on the right of way and thence to the plaintiff's premises, or directly to the latter without intervening medium, but it was clearly established that the fire originated in the one place or the other in the manner indicated, it was held that the jury were justified in returning a verdict for the plaintiff, without determining decisively where the fire first started."

The general doctrine announced by this text-writer is sustained by the line of argumentation adopted in Kenney v. Railroad, 70 Mo. 243, Torpey v. Railroad, 64 Mo. App. 382, and other cases that might be cited, though in those cases the question discussed pertained to engines setting out fires. Nevertheless, the reasoning employed fits a case where the issue is between two fires originating, possibly, in different ways.

Many cases have been collated by the industrious counsel of appellant in their brief proper and reply, directed to the general proposition formulated by MARSHALL, J., in Warner v. Railroad, 178 Mo. l. c. 134, to the effect that, "If the injury may have resulted from one of two causes, for one of which and not the other, the defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action." [See, also, Reiss v. Steam Co., 128 N. Y. 103; Grant v. Railroad, 133 N. Y. 657; Railroad v. Victory, 47 S. W. 440; Gas Co. v. Kaufman, 48 S. W.

434; Hughes v. Railroad, 91 Ky. 531; Hanrahan v. Railroad, 45 N. Y. Supp. 477; Railroad v. De Graff, 29 Pac. 664.]

But the propositions of law relied on and sustained by appellant's citations do not apply to the facts of the case at bar. Here, there are facts strongly sustaining the theory that the fire in the trestle was communicated through the accumulation of debris on the right of way. There were other facts rendering it possible that appellant might escape liability on the theory put to the jury that the fire was not communicated through such debris, but was carried from outside fires, directly to the trestle.

As said by a very wise and a very just jurist, CALDWELL, J. (though in a dissenting opinion) in Myers v. Railroad, 95 Fed. l. c. 414, "a jury is much more competent to determine these questions than the judges of this court." To the jury, then, the law leaves the matter, and in the presence of facts and inferences about which honest men might differ, the question does not resolve itself into one of law.

(5) The next serious contention of appellant is that the case should have been taken from the jury, because, conceding the negligent accumulation of rubbish on the right of way, and conceding, moreover, that the fire was communicated to the trestle through this debris, yet appellant's skirts are clean because it issued orders to clean up the right of way in the presence of impending danger from fire, which orders issued from the Superintendent to the Roadmaster and by him were transmitted to the section foreman, and that the section foreman and his men in negligently carrying out these orders were fellow-servants with respondent. To sustain this contention, we are referred to the fact in proof that by an act of the Federal Congress under date of May 2, 1890, certain laws of Arkansas were put in force in the Indian Territory and continued in force

to the time of the injury. The specific statute referred
to is one adopting the common law, reading thus:

"Ch. XX. *Common and Statute Law of England,
Sec.* 566. The common law of England, so far as same
is applicable and of a general nature, and all statutes
of the British Parliament in aid of or to supply the de-
fect of the common law made prior to the fourth year
of James First (a)  (that are applicable to our form of ·
government) of a general nature and not local to that ·
kingdom, and not inconsistent with the Constitution
and laws of the United States or the Constitution
and laws of this State, shall be the rule of decision in
this State, unless altered or repealed by the General
Assembly of this State."

Appellant under this head introduced in evidence
certain decisions of the Supreme Court of Arkansas
construing the common law relating to the negligence
of fellow-servants. These cases were as follows: Rail-
road v. Shackelford, 42 Ark. 417; Railroad v. Gaines,
46 Ark. 555; Railroad v. Rice, 51 Ark. 467; Fordyce v.
Briney, 58 Ark. 206; Railroad v. Henson, 61 Ark. 302.
And on the strength of the foregoing cases appellant
contends, *first,* that on the date of the act of Congress
putting in force in the Indian Territory the statutes of
Arkansas (May 2, 1890), the common law had been con-
strued by the courts of that State so that a section
foreman or roadmaster was a fellow-servant of a
brakeman on a freight train, and that there must be
read into the act of Congress that construction of the
common law. And, *second,* that such construction of
the common law is binding upon this court in a suit here
for injuries occurring in the Indian Territory.

Attending to these contentions, it may be said that
if the action was based on a statute of Arkansas, then,
out of comity (barring mere rules of evidence) we
should lean to the construction put on that statute by
the courts of that State. And further, if the statute

to be enforced were our own, but borrowed from Arkansas, our Legislature would be presumed to have borrowed the statute with the construction placed upon it by the courts of Arkansas. And, furthermore, it seems to be settled law that in a transitory common-law action, where suit is brought in a State other than where the injury happened, the interpretation of the common law obtaining in the State where the cause of action accrued, the *lex loci,* will govern. [Fogarty v. Transfer Co., 180 Mo. 490; Lee v. Railroad, 195 Mo. 400; Sanger v. Flow, 48 Fed. 152; Detroit v. Osborne, 135 U. S. 492; Walsh v. Railroad, 160 Mass. 571; Brewster v. Railroad, 114 Iowa 144; Helton v. Railroad, 97 Ala. 275; Alexander v. Railroad, 48 Oh. St. 623; Turner v. St. Clair Tunnel Co., 111 Mich. 578.]

In Alexander v. Railroad, supra, BRADBURY, J., speaking to the point, said:

"If the acts of the parties impose no obligations on the one hand and confer no rights upon the other, where they occur, no good reason is apparent why they should spring into active existence the moment the parties pass into another jurisdiction, where, if they had occurred therein, such relative rights and obligations would have resulted. An act should be judged by the law of the jurisdiction where it was committed. The party acting or omitting to act must be presumed to have been guided by the law in force at the time and place, and to which he owed obedience; if his conduct, according to that law, violated no right of another, no cause of action arose, for actions at law are provided to redress violated rights. Nor is it material that the rules of Pennsylvania law that deny relief to plaintiff in error result from the adjudications of the courts of that State, instead of being legislative enactments. The rules of law established by judicial decisions, are as binding as legislative enactments until modified or overturned by other decisions or legislative enactments binding within that jurisdiction. In theory it may be

true that there is no common law of Ohio, or of Pennsylvania; that the common law is one and the same in every State acknowledging its obligations; and that the decisions of one State are but evidence of it, not binding upon the courts of any other State; but, as a matter of fact, we know that, in the application of the rules of the common law to the affairs of men, there ·is, unfortunately, in the several States, a wide divergence; and that it necessarily follows that acts and transactions, sufficient in one State to create a cause of action, will not produce that result in another, and in the administration of justice mere theory must be made to yield to the truth as established by facts and experience.''

The gist of the matter is that if a litigant has no cause of action in the courts of the State in which he was injured, he has none elsewhere. As a matter of abstract reasoning, much might be said on the other side; because the force of the Federal statute was spent in adopting an Arkansas statute, itself merely adopting the common law. The common law is a common heritage, i. e., it is *our* law, and why should we not adopt our own construction of our own law? The writer of this opinion sympathizes with that view—otherwise, in passing on the common law we might speak with two voices and make ''confusion worse confounded;'' for it is practically conceded by appellant that our own construction of the common law is to the effect that section foremen or roadmasters, or even a section man, charged with the duty of providing a reasonably safe place for trainmen, a reasonably safe field of operations, to-wit, safe bridges, rails, ties and roadbed, are not fellow-servants with trainmen whose duty it is to operate trains, but stand as vice-principals to them.

It would serve no useful purpose to enter the maze of the labyrinth of judicial discussion and adjudication on this question (see Grattis v. Railroad, infra); but

we think the proposition announced above is sustained by the following cases: Parker v. Railroad, 109 Mo. 362; Relyea v. Railroad, 112 Mo. 86; Schlereth v. Railroad, 115 Mo. 87; Swadley v. Railroad, 118 Mo. 268; Burdict v. Railroad, 123 Mo. 221; Grattis v. Railroad, 153 Mo. 380; Jones v. Railroad, 178 Mo. 528; 12 Am. and Eng. Ency. Law (2 Ed.) 1005-6, and notes.]

Conceding, *arguendo,* that we should adopt the construction placed upon the common law by Arkansas courts in defining fellow-servants, yet a close analysis of the Arkansas cases cited leads us to conclude that the Supreme Court of Arkansas never went so far as appellant contends. The very most that can be said was that that learned court was ''heading''in that direction. But as seen by our own decisions, and pointed out in Grattis v. Railroad, supra, courts do not always go on the way they are headed, and it is not always safe to say that a court will reach a goal to which its face is turned and its steps directed. Indeed, we may allow to the Supreme Court of Arkansas the same right and disposition to establish a growth in the law or reconstruct its views that we arrogate to ourselves. Before that court reached the point appellant contends it had reached in principle, if it ever would have got there, the Legislature of Arkansas in 1893 (Acts of Arkansas, 1893, p. 68), passed a statute defining fellow-servants, which, with variations, this State has adopted. [R. S. 1899, secs. 2874 et seq.]

Let us examine the Arkansas cases relied on by appellant. In Railroad v. Shackelford it was held that a laborer on a construction train was a fellow-servant with the engineer on the same train.

In Railroad v. Gaines a brakeman and car inspector were held to be fellow-servants.

In Railroad v. Rice it was held that a yard inspector and a yard foreman, both under control of a yardmaster, were fellow-servants. In this case the distinction was drawn between ''chief inspectors'' and mere

yard inspectors, and it was held that the company would be liable for the negligent default of its chief inspectors. But that court did not yield its assent to the doctrine "that every yard inspector on the line of a railroad is a vice-principal."

In Fordyce v. Briney it was held that a car inspector and a car repairer are fellow-servants, where both are under the control and supervision of a foreman who had charge of the business of the company.

In Railroad v. Henson it was held that a bridge foreman and locomotive engineer are fellow-servants. But it must be said of that case that the facts in judgment showed the bridge foreman was hurt while moving with his men on the train run by the engineer. It seems that the bridge gang lived in boarding cars constantly on the move and being pulled over the road by engineers on the various trains. The case proceeded on the theory that the bridge foreman assumed the risk because he knew the manner and method of moving these trains. In that case the injury was caused by a collision.

Some of the foregoing cases would have probably been decided by this court precisely the same as they were by the Supreme Court of Arkansas—in fact, while the reasoning employed by the judges of this court on kindred questions may approach the subject-matter from a different standpoint and differ somewhat from reasons employed by our learned brothers of the Supreme Court of Arkansas, yet, it may be, all of the cases would have been decided the same way by this court at one time or another in its existence. At least, we are not willing to decide that the Supreme Court of Arkansas would have held, judged from its prior decisions, that the roadmaster, Sloan, would not represent appellant corporation when, as shown by the evidence, on the 13th of July he passed on a tour of inspection over the road, inspected the manner in which the debris had been handled about the trestle in question, from a mov-

ing train, presumably saw the condition of the right of way and stamped it with his approval. This court would have certainly held that Sloan's eyes, as well as the eyes of Parsons, the section foreman, were the eyes of the master and their judgment was the master's judgment, and it would be but a mere guess for us to say that the Supreme Court of Arkansas would not have said the same thing; because in Railroad v. Barry, 58 Ark. l. c. 204, the Supreme Court of that State used the following language and quoted approvingly the following authorities:

"It seems impossible to formulate any general rule for all cases. Each case must, to some extent, be governed by the peculiar circumstances attending it. In Railroad v. McKenzie it was held that, under the circumstances of that case, *a section boss and nightwatchman* represented the company, the court saying: 'Where the injuries are caused by the negligence of a servant, who is charged with the performance of duties which, by law, it is incumbent on the master to perform, such servant is regarded as the representative of the master, and, in legal contemplation, his negligence is the negligence of the master.' [81 Va. 71.] Judge COOLEY says: 'The master is not responsible to one person in his employ for an injury occasioned by the negligence of another in the same service, unless generally, or in respect of the particular duty then resting upon the negligent employee, the latter so far occupied the position of his principal as to render the principal so far chargeable for his negligence as for personal fault.' [Cooley, Torts, 564.]''

In our opinion, the case at bar was entitled to go to the jury on any theory of the law.

II. Complaint is made of the introduction of incompetent testimony, and it is contended by appellant that the court below committed prejudicial error in that behalf.

(1)  For instance, respondent, under an assurance of counsel, made *ore tenus,* that the same condition of things would be shown to continue down to the date of the injury, was permitted, over the objection of appellant that it was too remote, to show that in the April preceding large quantities of driftwood floated on the right of way and lodged against the trestle.  In making this assurance, counsel were betrayed by their zeal in the hot-foot of the trial; because they either would not or could not fulfill it, inasmuch as no such testimony was forthcoming.

Was the introduction of this testimony prejudicial error?  We think so.  Because:

The amount of the inflammable debris on the right of way and especially in the rows within three or four feet of the trestle was a material element in determining the negligence of appellant and, what is more, in determining whether that negligence caused the fire in the trestle.  The issue was the condition of the right of way at the time of the injury and the testimony should have been directed and confined to that issue.  It is true that other testimony of respondent was directed to the issue and it may be the jury had evidence upon which, with nice circumspection, they could have determined whether the amount of inflammable stuff there on July 16th would likely have caused the trestle to catch fire, but how can we say they were not influenced by the remote, unconnected testimony objected to?  If the human mind were so automatically self-adjusting as to forget improper testimony and retain and apply only the proper proof, no injury might have resulted, but unfortunately 'tis not so.  Here was a sharp issue on a vital question, with unfair testimony put in the balance, and who can say it had no effect in the result?

In Smith v. Sedalia, 182 Mo. l. c. 9 and 10, in an identical instance of a broken or forgotten promise, VALLIANT, J., said: "Upon that assurance [the assur-

ance of counsel to connect the remote testimony] the objection to the evidence was overruled. But the promised evidence was not adduced. The learned trial judge was justified in admitting the evidence on the promise given and he was also justified in sustaining the motion for a new trial on the ground that the defendant was unable to fulfill its promise. It is in the discretion of the trial court to allow counsel some choice as to the order in which they will introduce their evidence, but when counsel have been permitted to introduce evidence out of its usual order on their assurance that it will be connected and its relevancy shown later, if the promised evidence is not brought forward and if the irrelevant evidence is of a character likely to influence the jury and if the verdict is on that side, the trial court should set it aside and grant a new trial. The fact that the promise may have been made in good faith does not alter the effect of the illegal evidence.'' For other cases in point, see the brief of the learned counsel for appellant.

In this case, the motion for a new trial was overruled and in our opinion the trial court erred in that ruling. And this is so in spite of the insistence of respondent that appellant should have renewed its attack by a motion to strike out. Appellant was not in fault, why should it ask a second time for what was denied it at first, because of a promise of respondent broken thereafter? It was respondent who did the mischief, who *tolled* the court into error, and it was he who thence onward carried the burden of undoing the wrong and who must bear the blame.

Not only is the foregoing error in the case, but respondent was permitted to introduce testimony, over the objection of appellant, tending to show that when the right of way was originally cut through the timber, years before, the logs, etc., were thrown back and to some extent left on the right of way. This testimony tended to show a condition of things not even attempted

to be connected on down with conditions prevailing at the time of the fire. In fact, the debris struck at by the petition was described therein as driftwood "carried down said creek at high-water periods" and the proof was outside the specifications in the petition—made with unnecessary particularity, but nevertheless made and constituting the case appellant had to meet.

(2) In taking his depositions, respondent caused to be put to a medical witness this question:

"Q. If the testimony in this case shows that on the 16th day of July, plaintiff was in good health when serving in the capacity of head brakeman on a standard-gauge freight train upon a dark night; that he leaped from the locomotive engine, when upon the trestle, the distance of from ten to *twenty-five feet,* into the bottom of a dry creek, and that as he made the leap he was struck across the back in the vicinity of the lumbar region by *some timber, scantling* or *other railroad iron* —whether in your opinion, such a strike and such a fall would be sufficient to produce the injured condition in which you found Mr. Root to be?"

The question was objected to at the trial because it did not correctly state the facts in evidence from respondent and his witnesses, and the objection being overruled, appellant excepted, and the question was answered in the affirmative. The objection should have been sustained. A hypothetical question should be predicated on the testimony and this one was not. [Russ v. Railroad, 112 Mo. 1. c. 48, and cases cited.]

III. Appellant complains of the ruling of the court on instructions and this complaint has substance, in our opinion.

Appellant challenges the correctness of respondent's instruction numbered 7 as a rule of law. That instruction reads:

"You are instructed that it was the duty of the defendant to exercise ordinary care to keep its right of way free from dry and combustible matter which would

be *liable* to take fire and communicate to the trestle, and this duty is a personal duty of the defendant, is absolute in its nature, and cannot be delegated or entrusted to any of its agents, employees or servants so as to release itself from liability to the plaintiff for injuries sustained by him in consequence of the failure of any such agent, servant or employee to perform such duty, but upon the other hand when the authority is delegated or entrusted by the defendant to any such agent, servant or employee, the negligent acts or omissions of such agent, servant or employee becomes the negligence or omission of the defendant itself."

One criticism hinges on the phrase "*liable* to take fire," and it is insisted the word "liable" is a word of such wide play in meaning as to admit of a gloss rendering its meaning as, "within the range of possibility," and so this court held in Beasley v. Linehan Tr. Co., 148 Mo. 1. c. 421, in speaking of it when used in a petition. Substituting that meaning, we have an instruction telling the jury that the law imposed upon appellant the duty of keeping its *entire* right of way free from dry and combustible matter which, within the *range of possibility,* would take fire and communicate to the trestle, etc., and, so read, its error is so imprinted on its face that one who runs may read it there. This instruction should have told the jury that it was the duty of appellant to use ordinary care to keep its right of way free from such accumulations of combustible matter in such proximity to its trestle as would be subject to, or would probably, or would likely communicate fire thereto.

Conceding the word "liable" may shade off in some of its uses into probably or likely, yet other meanings are also attached to it, and its use was unfortunate, for no man can say what meaning was given to it by the jury. A. walks in the field in a rain: he is liable to be struck by lightning; B. rides in a boat: he is liable to be drowned; C. eats fish: he is liable to have a bone

stick in his throat—all these are allowable expressions, and yet neither A., B. nor C. is necessarily negligent in rowing on the river, walking in the field, or in eating fish.

The duty of·the master is performed in supplying a reasonably safe field of operations, a reasonably safe place. [Jones v. Railroad, 178 Mo. 1. c. 544.] Accumulations of inflammable matter on its right of way so close to a dry trestle and in such amounts as to endanger it by fire igniting the matter and thereby burning the trestle is negligence and the court should have so directed the jury in substance. Instead of so doing, the instruction in hand went beyond the rule regulating the duty of the master.

Leaving combustible material on the right of way is not negligence *per se*. Its *extent* and its *proximity to the track* may be such as to justly subject appellant to the imputation of negligence, and of this the jury are the judges and not the court. [Railroad v. Dennis, 38 Kan. 1. c. 426; White v. Railroad, 31 Kan. 1. c. 280, and cases cited; Taylor v. Railroad (Pa.), 34 Atl. 467; Railroad v. Bailey (Ind.), 46 N. E. 689; Railroad v. Sparks (Tex.), 35 S. W. 745.]

Other assignments of error in refusing and modifying instructions seem to us without merit as applied to the facts in judgment.

Otherwise than as stated, the cause was well tried. The judgment is reversed and the cause remanded to be proceeded with in accordance with this opinion.

*Brace, P. J.,* and *Valliant, J.,* concur; *Marshall, J.,* concurs in the result.