# LOUIS H. BUTTS, Respondent, v. GAAR-SCOTT & COMPANY, Appellant.

St. Louis Court of Appeals. Argued and Submitted February 9, 1912. Opinion Filed March 5, 1912.

1. TRIAL PRACTICE: Demurrer to Evidence: Waiver. Where defendant puts on evidence after his demurrer to the evidence offered at the close of plaintiff's case is overruled, and again offers a demurrer at the close of the whole case, he waives the first demurrer.

2. NEGLIGENCE: Questions of Law or Fact. What is negligence in a given case is a matter of law, but the determination of the facts constituting negligence or due diligence are for the jury.

3. ————: Injuries to Railroad Engineer: Vehicle Obstructing Track: Liability of Owner. In an action by a railroad locomo-tive engineer against the owner of a grain separator for injuries sustained by reason of a collision between the separator, which was stuck on the track at a crossing, and the locomotive, evi-dence *held* to present a question for the jury whether reason-able diligence was exercised by defendant to remove the sepa-rator from the track or to warn approaching trains of the obstruction.

4. TRIAL PRACTICE: Credibility of Witnesses: Province of Jury. The credibility of the witnesses and the weight to be given their testimony are questions for the jury.

5. RAILROADS: Injuries to Engineer in Crossing Collision: Contributory Negligence: Speed. Whether it is negligence for a railroad train to approach a country highway crossing at the regular, scheduled speed of about twenty-five miles an hour, there being no reason for apprehending an obstruction, is, in the absence of a statute regulating the speed, a question for the jury; and the burden is on the party asserting it to prove that such speed was excessive.

6. ————: ————: ————: Jumping from Engine. In an action by a railroad locomotive engineer, against the owner of a grain separator for injuries sustained by reason of his jumping from the engine while it was in motion, when a colli-sion between the separator, which was stuck on the track at a crossing, and the locomotive seemed imminent, whether, under these circumstances, it was negligence for him to jump from his engine while it was in motion, *held*, a question for the jury.

7. **NEGLIGENCE:** Contributory Negligence: Emergency Acts. Where a person, when confronted with a sudden peril, chooses what appears to him, in his fright and confusion, to be a means of safety, he is not guilty of contributory negligence as a matter of law because the means adopted turns out to be disastrous for him.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

AFFIRMED.

*Ferriss, Zumbalen & Ferriss* for appellant.

The court erred in overruling the demurrer to the evidence offered at the close of plaintiff's case, and again interposed at the close of the whole case, because: (a) There was no evidence of any negligence in warning the approaching train of the obstruction on the crossing. Frounfelker v. Railroad, 77 N. Y. Sup. 470; Railroad v. Culpepper, 19 Tex. Civ. App. 182; Smith v. Railroad, 113 Mo. 70. (b) There was no evidence tending to show any negligence in removing the obstruction from the crossing. (c) Plaintiff was himself guilty of negligence in operating the train, by approaching a dangerous public crossing at a high rate of speed, the crossing being hidden from his view until the train was almost upon it. 8 Am. and Eng. Ency. Law (2 Ed.), 390-392; 3 Elliott on Railroads, secs. 1160, 1161; Halferty v. Railroad, 82 Mo. 90; Stepp v. Railroad, 85 Mo. 229; Eswin v. Railroad, 96 Mo. 290; Sullivan v. Railroad, 97 Mo. 113; Haley v. Railroad, 197 Mo. 15; Holmes v. Railroad, 207 Mo. 149; Imp. Co. v. Stead, 95 U. S. 161; Railroad v. Netolicky, 14 C. C. A. 615; Ellis v. Railroad, 138 Pa. St. 506; Schwarz v. Railroad, 211 Pa. 625; Kinyon v. Railroad, 118 Ia. 349; Folkmire v. Railroad, 157 Mich. 159; Railroad v. Thompson, 62 Ala. 494; Railroad v. McGill, 121 Ala. 230; Railroad v. Mathews, 36 N. J. L. 534; Railroad v. Stoner, 2 C. C. A. 437; Kelly v. Rail-

road, 92 Mich. 19; Railroad v. Railroad, 154 Mo. App. 156. (d) Plaintiff was guilty of contributory negligence in jumping through the window of the cab while the train was running at full speed. Kleiber v. Railroad, 107 Mo. 240; McPeak v. Railroad, 128 Mo. 617; Richmond v. Railroad, 133 Mo. App. 463.

*Marion C. Early* for respondent.

(1) Persons attempting to cross railway tracks are required to exercise a degree of care commensurate to the possible dangers considering the character of the crossing, number of trains and the kind of machinery proposed to be transported over the crossing. Railroad v. Dunn, 56 Pa. St. 280; Gage v. Railroad, 6 Pa. Co. Ct. Rep. 4; Gramlich v. Railroad, 9 Phil. 78; Bullock v. Railroad, 105 N. C. 280; Railroad v. Ref. Co., 129 N. Y. 597. (2) After the breakdown on the crossing it was incumbent upon defendant and its servants to remove the obstruction within the shortest time and space possible, and to this end use all the aid and means available, and this was not done. There is evidence that there was ample time within which to have done so had a proper effort been made. The issue was fairly submitted to the jury and the verdict is conclusive. Railroad v. Lackey, 21 So. 444; Railroad v. Railroad, 37 Atl. 627. (3) It was incumbent upon defendant as soon as the breakdown occurred to use a high degree of care to warn approaching trains of danger. There is abundance of evidence that such efforts were not made, and the issue was properly submitted to the jury. Railroad v. Lackey, 21 So. 444; Railroad v. Railroad, 37 Atl. 627. (4) The plaintiff was not guilty of contributory negligence in jumping from the engine to save his life. He believed he was in imminent danger and the issue was properly submitted to the jury. Feddeck v. Car Co., 125 Mo. App. 24; Hull v. Transfer Co., 135 Mo. App.

119; Bren v. Transit Co., 108 Mo. App. 399; Railroad
v. Jacobs, 101 Ala. 149; Cottrill v. Railroad, 47 Wis.
634; Railroad v. Lane, 79 Tex. 643; Lierman v. Rail-
road, 82 Wis. 286.   (5) The train was running at its
usual and lawful rate of speed.   The statutes of Mis-
souri fix no rate of speed at which trains may not be
run outside of municipalities.   In this case the whistle
was sounded for the particular crossing and every
regulation observed.   Goodwin v. Railroad, 75 Mo.
73; Powell v. Railroad, 76 Mo. 80; Danskin v. Rail-
road, 22 L. R. A. (N. S.) 232; Dyson v. Railroad, 57
Conn. 9.   (6) The train had a right to a clear track.
Fiedler v. Railroad, 107 Mo. 645; and see Frost v.
Railroad, 96 Mich. 470.

STATEMENT.—This is an action by plaintiff against
defendant, appellant, to recover damages for personal
injuries sustained by him.   Plaintiff was a locomotive
engineer in the employ of the St. Louis & San Fran-
cisco Railroad Company, hereafter referred to as the
Frisco.   At the time of the accident he was in charge
of a locomotive of that company, driving his engine
attached to freight cars over the tracks of the railroad
company from the town of Eureka, Missouri, and be-
yond, the city of St. Louis, which is about twenty-
seven and one-quarter miles east of Eureka, being the
destination of his train.   When about three-quarters
of a mile east of Eureka and at a crossing of a public
road called the Blakey road, seeing that his engine
was about to run into a grain separator, which was
directly across the track at this crossing, plaintiff
jumped through the cab of his locomotive, with the re-
sult that both of his legs were broken between the an-
kles and knees and it became necessary to have both
amputated immediately below the knees, making him
a cripple for life.

The grounds of negligence averred in the petition
are, first, to state it generally, negligently and care-

lessly driving the separator and engine, hereafter called traction engine, and which was drawing the separator, on to the track of the railroad, whereby the separator became stuck on the tracks between the rails.

Second, that after the separator had been so negligently pulled upon the railroad track, the employees of defendant negligently and carelessly allowed the same to remain upon the tracks for about twenty or twenty-five minutes, although having a sufficient number of men immediately at hand, and sufficient means and appliances available readily and quickly to have removed the separator from the tracks and to have avoided the collision.

Third, that after the separator had been so negligently pulled and left upon the track of the railroad as before stated, that although defendant and its employees well knew or could have known with the exercise of ordinary care that trains were due to pass over and along the line of railway at frequent intervals and that they did so pass and that the separator in its position across the tracks, was liable to be run into by trains operated upon the railroad and injure the employees operating them and passengers upon the train, and to injure the trains, and knew that the separator, as an obstruction upon the track, was a dangerous menace to life and property, defendant and its employees in charge of the separator negligently and carelessly failed to notify the train dispatcher at Eureka and negligently and carelessly failed to send or attempt to send a flagman out in each or either direction to warn approaching trains of danger, and negligently and carelessly failed to give or make any ordinarily careful attempt to give any warning to approaching trains, though there were ample means and time with and within which warning could have been given to such trains, and negligently and carelessly allowed the separator to remain upon the track and obstruct the passage of trains for about twenty or twenty-

five minutes after the separator had become jammed in the tracks, thereby causing the accident. It is further averred that the train was running at its usual rate of speed; that immediately upon seeing the obstruction plaintiff applied the emergency brakes with full force, reversed the engine and did all in his power to check the speed of his train but seeing that a collision was inevitable and that the engine was liable to be derailed and the train wrecked, and believing that his life was in imminent danger by reason of being about to run into this obstruction, he sprang from the window in the cab of the engine and struck the ground with great force and violence. Averring his injuries as before stated and what his wages had been and that by the accident he was disabled from following his vocation as an engineer, he prayed damages in the sum of $40,000.

The answer of defendant, admitting its incorporation and that on the day of the accident it was the owner of the traction engine and separator, and that while these machines were under the charge and control of defendant's agent, one Johnson, an eastbound freight train of the St. Louis & San Francisco Railroad Company collided with the separator at the crossing, it denies each and every other allegation in the petition. As a further defense, defendant pleads the contributory negligence of plaintiff in that he failed to heed the signals given by defendant's servants for the purpose of flagging the train and failed to look ahead and keep proper watch to see that the track at the crossing of the public highway was unobstructed and ran the train at a high and dangerous rate of speed as it approached the crossing of the public highway and negligently jumped from the train while the same was running at a high and dangerous rate of speed.

The reply was a general denial of the new matter in the answer.

The cause was tried before a court and a jury. The evidence is quite voluminous. Probably the most intelligible way of stating the case is to commence with defendant's part of it. On the day mentioned, one Johnson, a district agent for defendant, who had been in the business of selling and handling traction engines and separators for some thirty years, left St. Louis and went to the farm of a Mr. Cihak, situate on or near the Blakey road, to take an engine and separator from that farm into Eureka, the intention being to load and ship the engine and separator back to defendant's factory at Richmond, Indiana. He was accompanied by his engineer, a Mr. Nevin, and also by Mr. Cihak, whom he had engaged to furnish fuel and haul water to fill the boiler, and they fired and steamed up. They also had a wagon and team in charge of a Mr. North, the wagon carrying water, fuel, a log chain and possibly other material. A son of Mr. Cihak, a boy about fourteen years old, was also with the party. The traction engine was connected up with the separator and after steam was up they started out along the road toward Eureka. The water wagon referred to was being driven ahead of the engine. They were going along the Blakey road in St. Louis county, which road runs past Cihak's farm toward the Frisco, then turning to the west runs along the side of the Frisco tracks for about 600 feet, and turning northwardly crosses those, not at a right angle but diagonally, and then takes on up a slight rise to the Missouri Pacific Railway Company's tracks, and crossing those about a quarter of a mile north of the Frisco, goes on west to Eureka. There is a slight rise from the Blakey road to the railroad at the crossing of the Frisco. About a quarter of a mile before the Frisco reached this crossing, as it leads east from Eureka, it curves sharply around a slight hill, but from Eureka to the curve the tracks are straight. The crossing is about a quarter of a mile west of the beginning of the

curve. When the traction engine and separator approached the crossing, Johnson and Cihak walked up to it and saw it was clear. Whereupon the engineer of the traction engine, being told to come ahead, steamed up and started toward the crossing. Reaching the crossing the traction engine passed safely over the tracks, but one of the wheels of the separator slid off of a plank inside of the south rail and became jammed. The traction engine still pulling, broke off a clip on one side of the axle, throwing the strain on the remaining clip, and forcing one of the front wheels under the body of the separator, so that the separator became immovable. The faces of these wheels of the separator are eight inches; the engine, an eighteen-horse power one, weighs about 1800 pounds, the separator about 6000 pounds, was about ten feet high from the ground to the top of the front end, and from front to rear is twenty-five feet and one inch over all, the body, from front to rear axles being fourteen feet, five and one-fourth inches. The tongue of the separator is twelve feet long and is attached to the front axle of the separator by two forks or "clips." As soon as the men in charge found the wheel was caught they disconnected the remaining clip. After doing that they grabbed hold of the front axle of the separator and tried to swing it back into position so that they could back the separator off the track if possible. They found they could not do that because the left wheel was wedged and they could not swing it, Johnson, Cihak, Nevin and a Mr. Peppers all pulling at it. Johnson then called to North to bring down the log chain from the wagon which was across the tracks and up on the hill. North threw it out of the wagon and Cihak took it down to the separator. They started to attach the chain to the front axle of the separator and Johnson called to North to bring the team down, that is the horses attached to the wagon. North refused to bring the

horses, as just then they heard a train which they first thought was on the Frisco tracks, but which proved to be on the Missouri Pacific tracks. As that train passed east they heard another train, and saw the men who were up on the hill between the Frisco and the Missouri Pacific tracks pointing toward Eureka and heard them hallooing to them, and they then saw the smoke of another train coming toward them from the west of Eureka on the Frisco track. At this time the traction engine was probably twenty feet north of the track and the separator projected over the track about seven and one-half feet of its own length, the balance of it trailing off south of the railroad tracks. The train which they had heard coming along the Frisco track, came on and its engine struck the separator and knocked it to pieces. There was evidence on the part of defendant tending to prove that as soon as it appeared that the separator was stuck on the crossing, Mr. Johnson had immediately sent Mr. Cihak's son along the track to the station agent at Eureka to notify the agent there that they had broken down on the track and to stop any trains approaching from either direction and told the boy to flag any train approaching from either direction and also told the boy to flag any train he saw approaching; told him to get to the station as fast as he could, and the boy testified that he started up the track "as tight as he could tear." After they heard the train whistle at Eureka and saw that it was coming down the Frisco track, Johnson told Mr. Cihak, Sr., to run up the track and flag it. Cihak started up the track immediately toward the train, ran as rapidly as he could with his hand and his hat up, calling and making all efforts he could to attract attention. After Cihak had gotten a short distance, Johnson, seeing that the train was apparently gaining speed, followed Cihak up the track, throwing up his hands and waving his hat and making every possible effort to attract the attention of the

engineer, while Mr. North remained at the separator, disconnecting the chain and pulled it and the tongue off the track and out of the way. Young Cihak testified that when the separator broke down, his father and Mr. Johnson sent him right off as soon as it happened to notify the agent to stop the train. He ran but did not get to the station; was at the twenty-seven mile post which, according to the plat, is about a quarter of a mile east of the station, when the train passed him. As the train came he waved his hat over his head and continued to do that until he had to get out of the way.

Joseph Cihak, Sr., testified that as soon as they had got caught on the track, he started his boy to Eureka and told him to run as fast as he could and notify the agent there was a machine broke down on the track so that he could stop the trains on both sides until they could get the machine off. His son started off pretty fast but he did not watch him. After testifying to what they had done in attempting to get the separator off and that he had gone to the water wagon to get the chain, he testified that North threw the chain out and unhitched the team but called out that he would not take the team down there. He looked around to see what was the matter and then noticed that somebody, probably one hundred yards off, was pointing up toward Eureka. He looked up and could see the smoke of the coming train and knew that the train was approaching. He called out, "The train is coming," and started up the middle of the track as quickly as he could run, waving his hat; got about two hundred yards (five or six hundred feet) up the track, maybe a little further, when he reached the train. When he saw the smoke, he knew the train was east of Eureka and that his son could not have got there in time to have stopped it, so he ran to try and flag it and he kept running and waving his hat until he had to jump off the track. To the best

of his judgment the separator had been on the track
from seven to ten minutes when the train struck it—
at the outside ten minutes. Johnson testified that he
ran up the track, waving his hat and arms, a distance
of four or five hundred feet, until he was about to be
run down by the train, and then jumped off the track;
did not see anyone in the cab until just before he
jumped off the track and then he saw the engineer and
the next instant the engineer (plaintiff) jumped from
the cab. He jumped about one hundred and fifty or
two hundred feet east of where he (Johnson) was.
Johnson testified that he had started up the track
after they had called for the chain and did not hear
the Frisco train whistle but he saw someone up on the
hill pointing up the track toward Eureka and then
saw the smoke and saw Cihak starting up the track
and he followed pretty close after him. He testified
that the separator was on the crossing from eight to
ten minutes before the train came, not to exceed ten
minutes; did not look at his watch, and in a deposition
which he had previously given, he had placed the time
at from ten to fifteen minutes but he now testified that
he did not think it was over ten minutes from the
time they were caught on the crossing until the acci-
dent occurred.

The testimony for defendant tended to prove that
the men with the machinery, assisted by a Mr. Pep-
pers, a by-stander, did all they could to clear the track,
and that the Frisco train came on and was running
at a rate of about thirty miles an hour when its engine
hit the separator.

The evidence on the part of plaintiff tended to
show that the separator had been across the railroad
track some twenty or twenty-five minutes before the
collision occurred. Plaintiff himself testified that as
he approached Eureka he whistled for the town when
about a mile west of it. They were then going thirty
miles an hour. The track is level there and straight.

He then whistled for the order board. They got no order board but the operator at Eureka came out and gave a stop signal whereupon the operator held up an order; the conductor got down on the step and got it from him. They had then slowed down to about ten miles an hour. After getting the order the brakes were released and the engine speeded up again. Plaintiff testified that as they left Eureka he saw no one on the track signalling the train. The train was running slow enough as it left the yards at Eureka had anyone called to them to have heard him. The track curves around a hill at the crossing and from the seat of the locomotive on which the engineer was standing he testified that he could see the crossing when about one hundred and fifty feet from it. He was standing up, leaning out of the window and looking ahead. On the fireman's side you could not see an obstruction twelve or fourteen feet high on the crossing until you were within one hundred yards of it. (It is to be said here that it was assumed that the separator was about twelve or fourteen feet high, instead of being under ten feet, as was subsequently developed.) The fireman called to plaintiff and gave him a "quick stop" sign, whereupon plaintiff set the brakes and emergency with full force, reversed the engine and did all in his power to stop the train. The first thing he saw as he approached the crossing was a man running toward them who had his hat off and was waving it above his head, which in railroad usage is called a "highball" signal, meaning that the track is clear. He heard no one call or make any noise. This man was between an electric block signal, which is about one hundred and fifty feet west of the crossing and the crossing, and about one hundred feet west of the crossing. After plaintiff saw this man waving his hat, he kept looking ahead and saw this big obstruction and thought the chances were that the engine would be derailed, the train wrecked and he would be killed; saw that a

collision could not be avoided. He testified: "I was overcome with fright; just simply lost control of myself for a moment and jumped off the train to save my life." When plaintiff jumped he testified that he came very near jumping on the man that he had seen running toward him and giving the "highball" signal. The first intimation that he had of any danger was from the fireman. As the engine approached the crossing and about six hundred yards west of it, he had blown the whistle for the crossing. At the time of the collision they were running about twenty-five miles an hour, which was the usual schedule speed at that crossing and the signals they had received were for a clear track from Eureka to Tyson, a station some miles east of Eureka, distance not given. Plaintiff further testified that he was thoroughly acquainted with the road and knew that he could not see that crossing more than one hundred yards off. He testified positively that there was no boy anywhere near the track after he left Eureka for if there had been one he was positive he would have seen him. He saw the obstruction just at the time he saw this man give what he called the "highball" signal, then he jumped feet foremost, going through the window of his cab. Plaintiff struck the ground about one hundred feet west of the crossing and got the signal to stop about one hundred feet west of that. At the speed at which the train was going it could have been stopped within five hundred yards.

The conductor of the train upon which plaintiff was engineer testified on behalf of plaintiff that he was in charge of the train that evening and knew the locality; that looking from the right hand side of the engine as you came to this crossing he did not think you could see over one hundred feet unless you hung way out of the window and looked around the boiler; from the left side of the engine you could see two hundred or two hundred and fifty feet, maybe further.

When he first saw the obstruction he thought they were within about three hundred feet. They were about that distance from it when the fireman or head brakeman hallooed and said there was something on the track. The engineer put the air on the emergency brake and reversed the engine and the witness jumped on the fireman's seat and when he looked back the engineer had jumped off. The first that he saw of anyone coming down the track to warn them was just about the time that the fireman or head brakeman had hallooed, when he saw a man wave a straw hat at them and just about the time that he saw this man the danger signal was sounded.

On cross-examination he said he could not tell how much of the separator was on the track; "it was just like a flash; just see it in front of you;" could not tell whether it stood at right angles or how it stood but could see it was a separator.

On redirect examination, he testified that he thought the man who had given the signal by waving his hat was about a couple of hundred feet or something like that; he did not measure it, but he judged it was about that far, west of the crossing.

Another witness for plaintiff, the head brakeman, was on the engine with plaintiff at the time of the accident; was at his usual place; as they approached Eureka they whistled. As they got to the station they slowed down to eight or ten miles an hour and answered the stop signal; as they were leaving the town of Eureka they did not observe anyone approaching the train. Asked if he thought that if anyone had been there, any man, going at that rate of speed, it would have been possible for him to have spoken or hallooed so that they could understand him, going at the speed they were, he answered that he thought they could. The first time he learned there was any danger on the track he should judge they were about two telegraph poles from the crossing. He was on the

Butts v. Gaar-Scott & Co.

left hand side of the engine, the north side of the
track. The first time his attention was called to the
fact that there was an obstruction on the track was
when he saw it himself, although before that the fire-
man had hallooed something but he did not know what.
He (the head brakeman) was looking ahead. As soon
as the fireman hallooed the engineer reversed the en-
gine, put the brakes and emergency on and the wit-
ness (the head brakeman) started to get off the en-
gine. There was nothing else could be done to stop
after the emergency brakes were set. This witness
stated that he was on the fireman's seat and started
to get off the engine but did not have time. He was
facing the engineer and saw him jump out of the cab
window but he (witness) did not have time to get
off so he jumped on the coal pile (in the tender)
about the time the engine struck the machine; stayed
on the engine until it had hit the obstruction and
jumped off after that but before the engine stopped.
He jumped off because he was afraid the engine would
turn over and kill him.

On cross-examination this witness was asked if
he saw a boy about fourteen years old on the track.
He answered that he did not. Asked if they were in
the habit of running through the country and ap-
proaching crossings on curves without slackening
speed, he answered that they observed all road cross-
ings and expected to stop if they got any warning
of danger. Asked if they run across crossings at the
same rate of speed as on other parts of the track, in
the absence of any orders to the contrary or any
knowledge of danger, he answered that they have no
orders to stop at country roads and that the prac-
tice is not to do so. From where he was standing
in the cab, on the inside and going toward the cross-
ing, he could see an obstruction twelve or fourteen
feet high about one hundred yards off. When he saw

164 App.—21

this obstruction he did not know whether it was on the track or not; could not tell until he got up to it, could not tell whether it was on or off the track. Asked within what distance he could tell something was on the track, he said not until he got within 150 or 200 feet, when he found out what it was; that he could tell that there was an obstruction on the track about 300 feet or two telegraph poles.

The fireman on the train with plaintiff at the time of the accident testified that he first became aware that there was any danger on the track when they were about 100 yards off, when he gave the engineer the stop signal, meaning "danger ahead." Asked if he had seen anybody coming toward the train before that, he answered that he had not, until about the time he saw the obstruction; could see the obstruction when he was about 300 feet from it and gave the danger signal as quick as he saw it, when the engineer immediately put on the emergency brakes and reversed the engine. There was nothing else the engineer could have done to stop the train.

On cross-examination this witness testified that it took them about five minutes to run from Eureka to this crossing on that date; it was about three-quarters of a mile between the two. At the time they struck the obstruction they were running about twenty-five miles an hour.

The station agent of the Frisco at Eureka testified that he was off duty on the evening of this accident; that trains average about one every forty-five minutes along the Frisco in the evening but freight trains are liable to come at any time either way. He saw this train on which plaintiff was engineer; was in his front yard a half a block north and a block west of the Frisco station at Eureka. He first heard them whistle for town and then for the order board and as the whistle was not answered, they whistled again

and he then saw the operator on the platform with his order hook, handing up orders to the conductor; it was what was called a No. 19 order, delivered to the train by means of a hook as the train passes, without the necessity of the train stopping. The train slowed up some for the orders; was then going about ten or twelve miles an hour. About the time the engine passed the depot he saw a little boy coming west up the track toward the station, down about the east switch, which was something like 600 feet east of the station; he had his hat off and was waving it above his head. The train was then moving ten or twelve miles an hour when he saw the boy waving his hat; thought it would have been possible for a man to have hallooed to the engineer or to have spoken to him so he could have heard with the train going at that rate of speed.

Mr. North, who was driving the water wagon before referred to, called as a witness by plaintiff, testified that he was there with his wagon and was part of the crew with Mr. Johnson in moving the traction engine and separator. He testified that the traction engine was the largest one he had ever seen in the country; that when they broke down Johnson and Cihak "were going forward and backward quite a while;" could not tell exactly what they were doing; "it seemed like they were trying to do something but they made no headway at anything." Witness's team was some distance further up the hill from the railroad and while he was there he heard a rig coming down from the Missouri Pacific crossing. It was driven by a Mr. Nollman and he went up and stopped him. Then a Mr. Peppers came with his team and he stopped him; Peppers went down to where the separator was across the track. Up to that time no one had called upon witness to assist in trying to move the separator from the track but "quite a while after" the separator had stuck on the track they called on him for the log

chain which he carried in his wagon. The chain was about twenty feet long. He heard the train on the Frisco whistle for Eureka. Up to that time there had not much of anything been done that he could see except to put the chain around the axle. When witness heard the train whistle for Eureka he hallooed to them that they had better get that off. They called to him to bring down the team; he unhitched and drove the team down but told Mr. Cihak that the best thing they could do was get the chain off as quick as they could as they were going to be knocked off. That was after he heard the train whistle for Eureka; had not been called on before this by anyone there to assist although he was there ready to assist; all he was called on to do was to get out the chain and to unhitch the team. "The Frisco train whistled just after they asked for the chain." Asked on cross-examination if Mr. Cihak or Mr. Johnson had not called to him to bring the chain right after they stopped or as soon as the separator stopped on the track, he said "No, sir;" could not tell what they had been doing before that as he did not see them doing anything.

Mr. Peppers, another witness for plaintiff, testified that he had been there on the day of the accident and was near the Missouri Pacific railroad, going down towards the Frisco crossing (the tracks being about 1400 feet apart). When he first saw the traction engine and separator he was about fifty feet south of the bridge on the Missouri Pacific crossing. They were just going on to the Frisco crossing and this witness drove on down toward it. He had a wagon and a team and drove down from the Missouri Pacific tracks at a common walk. When he got near the Frisco crossing he stopped his team and looked down to where Johnson and the other men were by the separator at the crossing. He saw Mr. North, Mr. Nollman, Mr. Cihak and two machine men there, six of them in all. This witness went on down to where the

machine was. When he got there the two machine men and Mr. Cihak were there. Asked if he saw anyone start toward the town of Eureka at that time he said he had seen Mr. Cihak's boy start; that after he (Peppers) was there a few minutes Mr. Cihak told this boy to go and see Snyder (the station agent) and tell him to flag the train ''that the separator was broke down on the crossing.'' The boy started down the track toward Eureka. Witness heard the train whistle for Eureka. He had already gotten down to the separator before he heard that. He heard nothing said about the log chain being brought or the team brought to assist in pulling the separator across until after the train had whistled for Eureka, then Mr. Cihak asked for the log chain; told Mr. North to bring down the log chain. In answer to a question as to how long the engine and separator were on the track from the time he saw it pulled on until he saw the train coming, he answered that he should judge from twenty to twenty-five minutes. He testified that he could walk from the crossing to Eureka in nine minutes; that he had tried it; that he could drive there in an ordinary trot from the crossing to Eureka in about five minutes; had done that. He did not at any time see any of the men about the separator afterwards send a flagman out at any time or hear anything said about it.

A Mr. Brundege, examined on the part of plaintiff, testified that he was engaged in sawmilling and threshing wheat; knew the crossing where the accident occurred; had crossed it several times; had seen the traction engine and had seen the separator; was accustomed to moving traction engines and separators over the country and across railroad crossing in that vicinity from time to time and is familiar with the lay of the land at this particular crossing. Asked how many men it would have required to move this traction engine back from the position in which it was

on the day of the accident, he answered that he should judge four or five men could have worked it off and pushed it down hill, possibly four, five or six, or about that number. If a log chain had been available he could have gotten it off by hitching to the engine and pulling it off, and he thought that could have been done in five, six or eight minutes. This witness stated that if he had been in charge of the separator at the time he could have gotten if off in from eight to ten minutes.

This is a summary of a great mass of testimony, not very complete, but sufficient to give the general facts, and to show the evidence in the case as to the effort made to get the separator across or off of the track, as to the warning given, as to the time that the obstruction had been on the track, was conflicting. We have given the evidence of plaintiff more fully than that of defendant, for at the close of that and again at the close of all the testimony the defendant interposed a demurrer to the evidence. The court refused each of these. The case was then submitted to the jury under instructions of the court and the jury returned a verdict in favor of plaintiff in the sum of $7500. Interposing a motion for new trial, which was overruled, plaintiff has duly perfected his appeal to this court.

REYNOLDS, P. J. (after stating the facts).—In their argument before us the learned counsel for appellant state that the only points they urge on this appeal are that the lower court committed error in overruling the demurrer to the evidence, asked by defendant at the close of plaintiff's case and also in overruling that demurrer when it was again offered at the close of all the testimony.

It is argued that these demurrers should have been sustained because, first, there was no evidence that defendant was guilty of any negligence in the

premises, and secondly, plaintiff's own evidence shows he was guilty of contributory negligence in approaching a dangerous crossing which could not be seen by the trainmen until they were close upon it, at full speed and without having his train under control and also in jumping through the window of the cab while the train was going at a high rate of speed. Counsel for appellant further state that the court submitted the case to the jury on the theory that defendant was negligent in two particulars, namely, first, in not warning approaching trains of the obstruction, and secondly, in failing to remove the obstruction from the crossing. It may be said here that the assignment of negligence in going upon the track and in the manner in which defendant's employees approached the track with the traction engine and the separator is out of the case, there being no claim that there was any negligence connected with that. It seems hardly necessary to cite authority in support of the rule that defendant, not standing on a demurrer to plaintiff's evidence in chief and then producing evidence, has waived the first demurrer. [See Frye v. St. Louis, I. M. & S. R. Co., 200 Mo. 377, l. c. 381, 98 S. W. 566.] We concern ourselves then with the demurrer at the close of all the evidence.

If we are to adopt the theory of the learned counsel for appellant, it would require us to hold as a matter of law, that after the employees of defendant found that the separator was blocked on the track and after they heard the approach of the train, they had used due diligence and taken proper and prompt steps to warn those in charge of the approaching train of the obstruction; that we should hold, as a matter of law, that defendant used due diligence in attempting to remove the obstruction from the crossing after the wheels of the separator had become blocked; that we should hold as a matter of law that plaintiff was guilty of contributory negligence in respect to those acts of

negligence with which he is charged. We cannot agree that under the evidence in this case these are matters of law.

What is negligence in a given case is a matter of law, but the determination of the facts constituting negligence or due diligence are for the jury. The second instruction given at the instance of defendant itself practically concedes this. That instruction tells the jury, "that the only issues before you are whether or not the servants and agents of the defendant were negligent in failing to remove the separator from the railroad track before the collision occurred; and whether or not the said servants and agents exercised ordinary care to notify the station agent at Eureka and warn approaching trains of the obstruction on the track; and whether or not the plaintiff was guilty of negligence directly contributing to his injuries, either in failing to see and heed the signals given him and the obstruction on the crossing in time to have averted the collision or in running his train at a high rate of speed in approaching said crossing, or in jumping from the cab of the engine while the train was running at a high rate of speed, as the above issues are defined in other instructions." It may be said as to the definitions referred to as covered by other instructions, no complaint whatever is made of them and, as before said, the only error assigned here is in overruling the demurrer to the evidence. That the evidence is conflicting on the issue as to whether the employees of defendant, in the exercise of reasonable diligence, could have removed the obstruction in time to have cleared the track for trains passing over the road, and particularly before the train upon which plaintiff was the engineer could have reached that point, is beyond question. The credibility of the witnesses who gave this testimony, the weight to be given it, were for the jury.

So too, with the evidence as to whether the employees and agents of defendant had exercised ordinary care to notify the station agent or warn approaching trains of the obstruction. The jury had the testimony as to what was done; they heard the positive testimony of plaintiff and his witnesses, that they received no notice whatever until within some three hundred feet of the obstruction and that the signals then given to them were of such a character that in railroad usage they understood them to be signals that the track was clear. Whether they were justified in so construing the attempt to signal them, was for the jury. While the testimony of the younger Cihak was that he had reached the train within a short time after it passed Eureka, and while there is testimony of one of the witnesses for plaintiff that he saw a boy up in that neighborhood, the testimony is equally positive on the part of plaintiff, the conductor, the fireman and the head brakeman, that they neither saw this boy at that place or at any place nor heard him hallooing to them or making any sign whatever. As to the testimony of Johnson and of the elder Cihak, of their advance down the track to warn the train, the time when they started to do this, the kind of signals they made, the means they employed to signal the train, these were all in evidence before the jury. It appears without question, from the testimony of these witnesses themselves, that when they had run but a short time and distance, the train was so close on to the obstruction that when they jumped out of the way of the approaching engine the train had not gone much over one hundred feet when plaintiff leaped from the cab, and that was but a short distance from the obstruction. Furthermore, the time when these two men and the boy had started up the track to give the warning, presented a conflict of testimony, the solution of which rested entirely with the jury. It was for the jury to determine whether proper precautions were

taken to warn approaching trains. It is in evidence that about forty-five regular trains passed there daily, and many freight trains. Cihak, at least, must have known this for he lived a very short distance from the crossing.

As to the rate of speed of the train being excessive, under the facts and situation, to sustain the contention of the learned counsel for appellant, we would be obliged to hold as a mattr of law that that rate was excessive. It is to be remembered that in the case at bar, this occurred in the country at a road crossing and no ordinance, as in case of street crossings in cities, regulates the speed nor does any statute do so. Aside from the statutory or municipal regulation, no rate of speed at which a railroad train may be run is negligence *per se*. [Powell v. Missouri Pacific Ry. Co., 76 Mo. 80; Young v. Hannibal & St. Joseph Railroad Co., 79 Mo. 336, 1. c. 340.] As is said in the latter case by Mr. Commissioner Philips, ''What would be a negligent rate of speed under certain circumstances might be wholly blameless under others.'' From the testimony in this case and especially aided by the plat in evidence and which is before us, while it appears that there is a sharp curve of the railroad track as the train goes east from Eureka and immediately before reaching this crossing, it appears that the Blakey road, as it is called, along which the traction engine and separator were being drawn, runs for 600 feet parallel with and to the south of the tracks of the railroad and after it crosses the tracks runs for a distance of about 1400 feet up an incline to where it crosses the Missouri Pacific tracks. It is evident that persons passing from the Cihak farm, where this machinery had been stored, to cross the road would have a fair view of the track as far up as Eureka, and that they had this view after they crossed the track is shown by the testimony of witnesses in this case who saw the smoke of the approaching en-

gine before it reached Eureka. So that so far as the public was concerned this was not a dangerous crossing as there was full opportunity for those traveling along the road to have warning of the approach of any train from Eureka. After the railroad tracks cross the public road they are straight for apparently over a mile and to the crossing of the Meramec river and beyond there to a station called Crescent, which appears to be about three miles east of Eureka. There was no reason therefore to call for a slackening of speed on the part of the engineer of the train, unless we are to hold as a matter of law that speed is to be slackened at all curves and crossings; he had sounded his whistle after leaving Eureka 600 yards east of the crossing, and long enough ahead to have cleared the track of pedestrians or of ordinary travel over it. Nor can it be contended that he had anything to look for but a clear track at this point, certainly had no occasion to anticipate a permanent obstruction of this kind on it.

Whether the speed was excessive was a question of fact. There are cases where, in the absence of a statute or ordinance upon the subject, considered in connection with other circumstances, the court may be justified in declaring as a matter of law that the company was guilty of negligence in running its train at an excessive and dangerous rate of speed under the circumstances of that particular case. Mr. Elliott in his work on Railroads, 3 Elliott, Railroads (2 Ed.), sec. 1160, says: "In the absence of any statute or ordinance upon the subject, no rate of speed is negligence *per se*. . . . Ordinarily, however, the question is one of fact for the jury." See, also, Chicago & Northwestern Railway Co. v. Netolicky, 14 U. S. C. C. A. 615 (67 Fed. Rep. 665), a decision by the United States Circuit Court of Appeals for the Eighth Circuit, the opinion written by Judge Thayer, concurred in by Judges Caldwell and Sanborn. So we have found

it treated by all the cases in our state which have been referred to even by industrious counsel for appellant. We are unable to say, as claimed by those counsel here we must, that the rate of speed was, under the circumstances of this case, so excessive as to render its maintenance at that place negligence *per se* and to declare as a matter of law in this case that such was so clearly a matter of negligence on the part of this plaintiff, the engineer, that we should declare that he cannot recover. The burden of proving that this speed rate, pleaded by defendant as a contributing act of negligence, was excessive, was upon defendant. It is uncontradicted that the speed was the usual one for that train at that point; it was called for by the train schedule, apparently; the engineer was running under orders and with notice that the track was clear. He had sounded his whistle; he had no reason to apprehend the presence of such an obstruction.

The remaining ground for claiming that a verdict should have been directed for defendant and its demurrer sustained, is the act of plaintiff in jumping out of the window of his cab when he saw the imminence of colliding with the obstruction across the track. This is claimed as a contributing cause, the burden of sustaining which was also on defendant. To sustain the contention of counsel for appellant, we would have to declare as a matter of law that this act of plaintiff was also negligence *per se*. This we cannot do. Our Supreme Court in Kleiber v. The People's Ry. Co., 107 Mo. 240, 17 S. W. 946, has settled this proposition in our state. It is there said (l. c. 247): "It is as well settled as any other principle of the law of negligence that, if one, by the negligence of another, has been placed in a situation of apparent imminent peril, he is not required, in attempting to escape therefrom, to use the judgment and discretion that is required of him when not dominated by terror of impending danger; and if, without having time to deliberate, and

acting upon the instinct of self-preservation, and as a prudent person might be expected to act in the circumstances, he is injured by adopting a dangerous alternative, he may still recover from the one by whose negligence he has been impelled to act. This is true, though no injury would have resulted had no attempt to escape been made." Citing many cases and quoting from others in support of this rule, Judge MACFARLANE concludes, at page 249: "From these decisions the following rules, essential to liability may be deduced: First, the peril or alarm must have been caused by the negligence of the one against whom indemnity is sought; second, the apprehension of peril, from the standpoint of the injured person, must have been reasonable, and, third, the appearance of danger must have been imminent, leaving no time for deliberation. On the other hand the danger must be judged by the circumstances as they appear, and not by the result." See, also, Root v. Kansas City Southern R. Co., 195 Mo. 348, l. c. 356, 92 S. W. 621, and Chicago & Northwestern Ry. Co. v. Netolicky, supra in which passing on a motion for rehearing, Judge Thayer has said (l. c. 624): "We are unwilling to declare, as a matter of law, that a person who is called upon to act under such circumstances, and to act instantaneously, is guilty of negligence if he does not choose the safer course. In such a case the inference of contributory negligence, if it is a justifiable inference, should be drawn by the jury, rather than by the court." In brief our Supreme Court as well as the United States Circuit Court of Appeals declined to say as a matter of law that choosing what appeared to him to be a means of safety in his fright and confusion and that means turning out to be disastrous to him, the plaintiff can be held guilty of contributory negligence. So it has been held and the rule applied in Feddeck v. St. Louis Car Co., 125 Mo. App. 24, 102 S. W. 675, by this court, and in Hull v. Thomson Transfer

State ex rel. v. Homer.

Co., 135 Mo. App. 119, 115 S. W. 1054, by the Kansas City Court of Appeals, it being held in the latter case (1. c. 123) that the question as to the act of the plaintiff under the circumstances and as to whether he acted as an ordinarily prudent person might be expected to act under similar circumstances was a question for the jury. We think these cases sufficient to warrant us in declining to hold as a matter of law that plaintiff contributed to his own hurt by jumping from his engine.

Summarizing our conclusions on the facts and the law, we hold that there was evidence to support a verdict either way; ample evidence that would support a verdict for the plaintiff under proper instructions. The jury has found against the defendant; it was properly instructed; that finding has been affirmed by the learned trial judge. On careful consideration of all the testimony in the case and weighing the arguments and consulting the authorities of counsel for appellant, we can arrive at no conclusion but that the judgment of the circuit court should be and it is affirmed. *Nortoni* and *Caulfield, JJ., concur.*

